**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Daniel C. Powers, ) | No. CV 06-2109-PHX-MHM |
| ) | |
| Plaintiff, ) | **ORDER** |
| ) | |
| vs. ) | |
| ) | |
| ) | |
| Michael J. Astrue, Commissioner, Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

Plaintiff Daniel C. Powers seeks judicial review of the Administrative Law Judge's decision denying his claim for disability insurance benefits. 42 U.S.C. §405(g).

I.   PROCEDURAL HISTORY

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act , 42 U.S.C. §423, in May 2003 based on his inability to work beginning on April 15, 2002. (Transcript ("Tr.") 19). Plaintiff's application was denied initially and also upon reconsideration. (Id.). Plaintiff timely filed a request for a hearing and a hearing was held before Administrative Law Judge ("ALJ") Michael J. Cianci, Jr., on June 1, 2005. (Id.). On July 14, 2005, the ALJ issued a partially favorable decision granting disability benefits from April 15, 2002, through April 30, 2003. (Dkt. #1, p.2). However, the ALJ found improvement in Plaintiff's condition beginning May 1, 2003 and concluded that Plaintiff could have returned to his past work at that time. (Id.). Plaintiff

filed an administrative appeal with the Appeals Council which was summarily denied by notice dated July 7, 2006, making the decision of the ALJ final. (Dkt. #1, p.2). Plaintiff claims that the ALJ's decision errs in fact and in law and is unsupported by evidence. (Dkt. 31, p.3). Furthermore, Plaintiff claims still to be disabled and entitled to Social Security benefits. (Id.).

Plaintiff commenced an action for review of the administrative determination in this Court on September 1, 2006, pursuant to 42 U.S.C. §§405(g) and 1383(c). Defendant filed an answer and a certified copy of the transcript of record on November 13, 2006. (Dkt. #9). On February 26, 2007, Plaintiff filed a motion for summary judgement (Dkt. #16) supported by a statement of facts (Dkt. #19) and memorandum of points and authorities (Dkt. #21). On March 28, 2007, Defendant filed a cross-motion for summary judgment (Dkt. #23) supported by a statement of facts (Dkt. #24) and a memorandum of points and authorities. (Dkt. #25). Plaintiff filed a response to Defendant's cross-motion for summary judgment and a reply to the Commissioner's response to Plaintiff's motion for summary judgment on April 16, 2007. (Dkt. #27,28).

II.   STANDARD OF REVIEW

This Court must affirm the ALJ's findings if they are supported by substantial evidence and free from reversible legal error. Marcia v. Sullivan, 900 F.2d 172, 174 (9th Cir. 1990). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971); Clem v. Sullivan, 894 F.2d 328, 330 (9th Cir. 1990).

In determining whether substantial evidence supports a decision, the Court considers the record as a whole. Richardson, 402 U.S. at 401; Tylitzki v. Shalala, 999 F.2d 1411, 1413 (9th Cir. 1993). If there is sufficient evidence to support the ALJ's determination, the Court cannot substitute its own determination. Young v. Sullivan, 911 F.2d 180, 184 (9th Cir. 1990). Where evidence is inconclusive, "questions of credibility and resolution of conflicts in the testimony are functions solely of the [Commissioner]."

Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  Therefore, if on the whole record before the Court, substantial evidence supports the Commissioner's decisions, this Court must affirm.  Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989); 42 U.S.C. § 405(g).

An ALJ determines an applicant's eligibility for disability benefits through the following five steps:

(1) determine whether the applicant is engaged in "substantial gainful activity";

(2) determine whether the applicant has a "medically severe impairment or combination of impairments";

(3) determine whether the applicant's impairment equals one of a number of listed impairments that the Commissioner acknowledges as so severe as to preclude the applicant from engaging in substantial gainful activity;

(4) if the applicant's impairment does not equal one of the "listed impairments," determine whether the applicant is capable of performing his or her past relevant work;

(5) if the applicant is not capable of performing his or her past relevant work, determine whether the applicant "is able to perform other work in the national economy in view of his [or her] age, education, and work experience."

Bowen v. Yuckert, 482 U.S. 137, 140-41 (1987) (citing 20 C.F.R. §§ 404.1520(b)-(f)). See 20 C.F.R. § 416.920. At the fifth step, the burden of proof shifts to the Commissioner.  Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993).

III.     BACKGROUND FACTS

Plaintiff was injured at work in December 2001 while lifting some heavy objects. (Tr. 21).  He was diagnosed with cervical disease and cervical myelopathy with some prominence on the right side, and underwent a trilevel cervical decompression and fusion surgery on April 15, 2002.  (Id.).  Plaintiff also suffers from depression and anxiety. (Dkt. #16 ¶5).

- 3 -

A.   MEDICAL RECORDS FROM APRIL 15, 2002 THROUGH APRIL 30, 2003

Following the April 15, 2002 surgery, the surgeon, Paul W. LaPrade, Jr., M.D., saw Plaintiff on three occasions. (Tr. 198, 195, 191). Although Dr. LaPrade noted that Plaintiff was doing better, Plaintiff still had pain and numbness in his right arm and hand. (Tr. 185). An MRI in June of 2002 revealed that Plaintiff had neural foraminal stenosis (narrowing of the space inside the bony spine) primarily on the right side due to degenerative changes (Tr. 213) with no cord compression. (Tr. 212). A neuromuscular electrodiagnostic examination indicated that Plaintiff was experiencing right cervical radiculopathy involving the right C6-7 nerve roots and mild carpal tunnel syndrome. (Tr. 169). Dr. LaPrade authorized Plaintiff to return to work on July 8, 2002. (Tr. 181). The ALJ rejected the opinion of Dr. LaPrade, that Plaintiff could return to work, as "incongruent with the evidence as a whole." (Tr. 22). However, the ALJ also found this same opinion "to be probative," and used it to support their decision that Plaintiff was no longer disabled as of May 1, 2003. (Tr. 27).

Plaintiff was referred by Dr. LaPrade to a physical medicine specialist, John M. Kozak, M.D., in September 2002, because of Plaintiff's ongoing pain. (Tr. 177). Plaintiff complained of "right neck pain with significant limitations in range of motion. He [had] intermittent sharp pain down the right arm with spasming in the right hand." (Id.). He also gets "numbness and tingling in the right hand with associated weakness in the right arm." (Id.). Dr. Kozak diagnosed Plaintiff with chronic right cervical radiculopathy, cervical spinal stenosis with myelopathy status post C4 to C7 decompression with fusion, secondary cervical strain, and significant neck and shoulder girdle atrophy. (Tr. 179). He prescribed physical therapy for strengthening and pain reduction. (Id.). Electrical stimulation was prescribed for the atrophy and pain control. (Id.). Neurontin was prescribed to treat neuropathic pain; and epidural injections, also for pain. (Id.). On a follow up visit in October 2002, Dr. Kozak noted improvements and continued with the same treatment. Dr. Kozak authorized golfing and fishing. (Tr. 366).

- 4 -

1  At that time, Plaintiff only complained of pain with sudden neck movement and
2  occasional paresthesias in the upper extremities. (Tr. 366).
3       Plaintiff moved to South Carolina where he was seen by William M. Rambo, Jr.,
4  M.D., a neurosurgeon, in January 2003. (Tr. 222). Plaintiff was still experiencing pain
5  and weakness and also complained of facial pain. (Tr. 222). Dr. Rambo commented that
6  Plaintiff's "symptoms are not out of the ordinary for this size of procedure." (Tr. 223).
7  Dr. Rambo's radiographic review showed some mild cord compression. (Tr. 222). After
8  reviewing the plain films and being satisfied with the progress of the cervical spine, Dr.
9  Rambo recommended continuing the exercise rehabilitation program and discontinuing
10 the neurosurgical evaluation and treatment. (Tr. 221). Dr. Kozak later indicates that Dr.
11 Rambo was disinclined from doing anything more because the surgery had been
12 performed by someone else. (Tr. 364).

13     B.    MEDICAL RECORDS AFTER APRIL 30, 2003

14      In June 2003, Plaintiff was seen by W. Randal Westerkam, M.D., a physical
15 medicine specialist. (Tr. 278). Plaintiff complained of intermittent numbness in his left
16 hand and forearm as well as his right forearm. (Tr. 278). He also complained of
17 intermittent severe pain at the back of his neck, intermittent spasms, and fatigue. (Tr.
18 279). Dr. Westekam noted decreased range of motion in all planes. (Tr. 279). He noted
19 that Plaintiff "has done fairly well following rather extensive surgery with the majority of
20 his neurologic symptoms improved." (Tr. 279). However, he also noted that "because of
21 his fusion, there is some mechanical disadvantage of the scapular and other cervical
22 musculature which is creating ongoing pain." (Tr. 280). He recommended continued
23 exercise and opined that ongoing use of Neurontin may be contributing to Plaintiff's
24 fatigue and decided to take Plaintifff off of it. (Tr. 280). He recommended Plaintiff
25 continue taking Motrin, as needed, for pain. (Tr. 280).
26      In August 2003, Plaintiff was assessed by Joyce Lewis, M.D., a non-examining
27 physician employed by a state agency. Dr. Lewis performed a "Physical Residual
28 Functional Capacity Assessment" (Tr. 241-248) and determined Plaintiff was capable of

doing light (Dkt. #24 p.4) or medium (Dkt. #16 p.11) work. In making its determination, the ALJ found that Dr. Lewis' opinion was "no longer supportable in light of the entire record." (Tr. 22). However, the ALJ also concluded that Dr. Lewis' opinion supported the finding that Plaintiff was no longer disabled after May 1, 2003, and took it into consideration as a "nonexamining expert source." (Tr. 27).

In November 2003, Plaintiff was examined psychologically at the request of the state agency by J.P. Ginsburg, Ph.D. (Tr. 250). The prior diagnosis of panic disorder was confirmed, and Dr. Ginsburg also diagnosed Plaintiff with adjustment disorder with depression and anxiety. (Tr. 252). Plaintiff was given a global assessment of functioning ("GAF") score of 59 (Tr. 259) which is a moderate level of functioning. (Dkt. #19 p.12). Dr. Ginsburg stated that Plaintiff's "[i]mpairments due to his disorder (not counting physical limitations) appear to be mild for activities of daily living and social interactions." (Tr. 253). With regard to the workplace environment, Dr. Gingsburg stated that, given the chronic and sometimes severe pain, Plaintiff's overall ability in the workplace would be fair and the likelihood of decompensation would be great. (Tr. 253).

In November 2003, Plaintiff saw Dr. Westerkam for a follow-up visit. (Tr. 276). Plaintiff complained of low abdominal pain, low back pain, and other musculoskeletal pains. (Tr. 276). Dr. Westerkam found these symptoms to be consistent with sacroiliitis and prescribed more physical therapy and an anti-inflammatory. (Id.). An MRI of the lumbar spine, conducted the following month at Dr. Westerkam's request, revealed an L3-4 annular bulge impressing upon the thecal sac. (Tr. 281). The MRI also showed signs of degenerative joint disease (DJD), and a disc protrusion resulting in "mild to moderate canal stenosis in association with bilateral facet joint hypertrophic DJD changes." (Tr. 281). During a follow-up visit in January, Plaintiff reported that he was doing better with the physical therapy and medication, though he was still experiencing intermittent neck pain as well as low back pain radiating down the right leg. (Tr. 274). Dr. Westerkam noted that there is no significant disc protrusion or spinal stenosis upon review of the December MRI. (Id.).

In March 2004, Plaintiff was assessed by Richard Weymouth, M.D., a nonexamining physician employed by a state agency. (Tr. 311-318). A "Physical Residual Functional Capacity Assessment" administered by Dr. Weymouth showed limitations consistent with "medium" exertional level work. (Dkt. #19 p. 14). This assessment was similar to the nonexamining physician assessment conducted in August 2003, and was also considered by the ALJ as a "nonexamining medical source." (Tr. 22).

In April 2004, upon returning to Phoenix, Plaintiff saw Dr. Kozak again. (Tr. 364). Plaintiff continued to experience neck problems and problems with his right side, including right-sided sciatica. (Id.). He continued to suffer from fatigue. (Id.). Dr. Kozak noted "marked limitations in all planes secondary to increased pain and stiffness." (Tr. 365). Dr. Kozak diagnosed chronic right cervical radiculopathy, cervical stenosis with myelopathy status post C4-7 decompression with fusion, and cervicothoracic strain. (Id.). He prescribed a low dose of Neurontin again. Since plaintiff had experienced gastro-intestinal bleeding, anti-inflammatory medication could no longer be prescribed. (Id.). The cervical MRI screening prescribed by Dr. Kozak revealed "mild, multi-level neural foraminal narrowing and spinal canal stenosis." (Tr. 361-362). The lumbar spine MRI revealed disc protrusion, mild central canal stenosis, bilateral pars interarticularis defects, and moderate facet arthrosis. (Tr. 358).

In May 2004, Plaintiff was referred to Harry S. Morehead Jr., M.D., a neurologist. Dr. Morehead examined Plaintiff in order to address his intermittent neurologic symptoms which he found to be related to the cervical region. (Tr. 391). He made no changes to the medication and prescribed tests that later ruled out some of his suspicions about the source of the symptoms. (Id.).

In May 2004, Plaintiff again saw Dr. Kozak. (Tr. 353-354). Dr. Kozak found Plaintiff's status essentially was unchanged. (Id.). Dr. Kozak discontinued physical therapy but continued the home exercise program. (Id. at 354). By Plaintiff's July 2004 visit, Plaintiff's pain had increased. (Tr. 349). Dr. Kozak increased the Plaintiff's Neurontin dosage and prescribed cervical facet joint injections for pain (Tr. 350), which

1  had good results (Tr. 348).  In August 2004, Dr. Kozak reported that Plaintiff was
2  suffering from right lumbrosacral radicular symptoms for which he prescribed an epidural
3  injection. (Tr. 348).  Although the injections did improve symptoms, plaintiff suffered
4  from spasms and cramping as a result of his moving into a new apartment.  (Tr. 344).

5  In September 2004, Dr. Kozak reported that Plaintiff was suffering from diffuse
6  myalgias (muscle pain) and increased pain in the neck, back, hips, and left big toe.  (Tr.
7  343).  Plaintiff reported that he had suffered two accidental injuries since his last visit.
8  (Id.).  He was having gastro-intestinal problems as a result of medication.  (Id.).  He
9  thought his school attendance was increasing his pain symptoms. (Id.).  He had developed
10 skin lesions on his back.  (Id.).  Dr. Kozak prescribed Medrol Dosepak (a corticosteroid),
11 increased Neurontin, and discontinued Vioxx.  (Tr. 344).

12 In October 2004, Plaintiff reports to Dr. Kozak that the Medrol Dosepak injection
13 resolved his pain complaints for ten days.  (Tr. 341).  However, his symptoms worsened
14 and he suffered from increased fatigue as it left his system, feeling "like a train hit him."
15 (Id.).  Plaintiff's positive reaction to the Medrol Dosepak injection suggested to Dr. Kozak
16 that he may have an underlying disorder for which he referred Plaintiff to a
17 rheumatologist. (Tr. 342).  Plaintiff was taken off of the Neurontin because it was no
18 longer effective.  (Id.).  Dr. Kozak prescribed Mobic, a nonsteroidal anti-inflammatory,
19 and Keflex for the lesions on his back.  (Id.).

20 In October 2004, the rheumatologist, Joseph S. Habros, M.D., diagnosed
21 "polyarticular joint pain with variable pain on movement, soft tissue [illegible] hands and
22 feet which varies."  (Tr. 410).  "Dermititis - hx [history] of psoriasis with the possibility
23 of a component of psoriatic arthritis completing the picture."  (Id.).  Dr. Habros
24 prescribed methylprednisolone, a glucocorticoid.  (Dkt. #19 p.18).  Blood tests ruled out
25 some possible causes of Plaintiff's symptoms.  (Tr. 413-415).  During the follow-up visit
26 in November 2004, Dr. Habros prescribed Prednisone and Relafen, but Plaintiff still had
27 pain and decreased range of motion.  (Tr. 407).  Dr. Habros suspected an "inflammatory
28 process" or psoriatic arthritis.  (Id.).  Dr. Habros reported that Plaintiff was still suffering

- 8 -

1    from pain and medications were continued during follow-up visits in January and
2    February. (Tr. 404-406).

3          In March 2005, Dr. Kozak again saw Plaintiff, who was experienceing "pain all
4    over." (Tr. 339). Dr. Kozak reported that Plaintiff "seem[ed] to have a generalized
5    problem based on his reaction to the steroids . . . not . . . isolated musculoskeletal
6    problems, but more of a diffuse problem." (Id.). Although Plaintiff had gastro-intestinal
7    problems with prednisone and Relafen, Dr. Kozak prescribed Relafen alone to see if he
8    could tolerate it. (Tr. 340). Additional tests were conducted to see if there would be any
9    difference since Plaintiff had been taken off steroids. (Id.). Also in March 2005, Ralph
10   Bennett, M.D., a rheumatologist saw Plaintiff. (Tr. 368-371). Plaintiff continued to
11   suffer from pain, reduced sensation, and limited range of motion. (Tr. 369). Dr. Bennett
12   ordered tests, which had negative results. (Tr. 372-373).

13         In April 2005, Dr. Kozak saw Plaintiff and conducted an electromyographic
14   examination which revealed "mild bilateral carpal tunnel syndrome, most likely due to
15   playing musical instruments." (Tr. 334). He characterized this disorder as "mildly
16   symptomatic." (Id.). Dr. Kozak also discontinued Relafen in April. (Tr. 338).

17         In May 2005, Dr. Bennett diagnosed fibromyalgia (Tr. 368), "a rheumatic disease
18   that causes inflammation of the fibrous connective tissue compartments of muscles,
19   tendons, ligaments, and other tissue." Benecke v. Barnhart, 379 F.3d 587, 589 (9th Cir.
20   2004). He also completed a "Pain Functional Capacity Questionnaire," which was based
21   on his independent clinical judgment, in which he concluded that Plaintiff "suffered from
22   moderately severe pain," which is defined as "seriously affect[ing] ability to function."
23   (Tr. 381). This level of pain is often "sufficiently severe to interfere with attention and
24   concentration" (id) and often results in "failure to complete tasks in a timely manner (in
25   work settings or elsewhere)." (Tr 382). According to Dr. Bennett, the moderately severe
26   level of pain can "reasonably be expected to result from objective clinical or diagnostic
27   findings . . . documented . . . in the medical records." (Tr. 381).

28

- 9 -

Dr. Habros conducted a "Medical Assessment of Ability To Do Work Related Activities" in May 2005. (Tr. 421). Based on his clinical evaluation, Plaintiff is highly limited in his ability to perform exertional activities, such as standing, walking, sitting, lifting, and using hands and feet, and would probably be precluded from employment. (Id.). Furthermore, Dr. Habros' "Pain Functional Capacity Questionnaire" reported that Plaintiff suffered from severe pain that constantly interferes with attention and concentration. (Tr. 423).

### C. THE HEARING TESTIMONY

In June 2005, a hearing was held during which Plaintiff's counsel argued that Plaintiff met the criteria for presumptive disability (Tr. 436) or, alternatively, that an additional hearing should be held with agency medical expert testimony. (Tr. 440). Plaintiff testified that he suffered from ongoing pain symptoms of the neck and back since his surgery in April 2002 (Tr. 451), and had problems involving his right arm (Tr. 449). Due to the persistence of Plaintiff's condition, Plaintiff's counsel argued for ongoing disability benefits. (Tr. 469). When questioned by his attorney, Plaintiff testified about his persistent, sometimes extreme pain. (Tr. 451). He said that it varies day-to-day depending on his level of activity and his medication. (Id.). He testified about the constant dysfunction of his right hand and occasional dysfunction of his left, depending on level of activity. (Id.). Plaintiff describes the pain in the low back and the legs as sharp, stabbing, and electric. (Id.). He states that the doctors are now focused on the persisting body pain which was caused by spinal cord damage from the surgery. (Tr. 454).

When questioned by the ALJ, Plaintiff testified about his move to and from South Carolina. (Tr. 455). The ALJ's questions highlighted Plaintiff's various physical activities, such as his participating in the drive to and from South Carolina, attending school, driving to and from school, and his ability to play musical instruments. (Id.). Despite his condition, Plaintiff testified that he was enrolled in three music classes, to keep his mind and body active, at the recommendation of a psychologist. (Tr. 444).

- 10 -

1  Plaintiff said he has difficulty driving (Tr. 443), writing (Tr. 445), reading (Tr. 446),
2  using a computer (Tr. 452), and playing musical instruments (Tr. 456) because of the pain
3  restrictions on moving his neck and hand cramping. (Tr. 445-446). He testified that he
4  must create modified "set-ups" for reading, note-taking, and exam-taking, in order to
5  compensate for his condition. (Tr. 461).          Plaintiff's counsel requested that the ALJ
6  reject the July 2002 opinion of Dr. LaPrade, that Plaintiff could return to work just two
7  months after surgery, as inconsistent and inappropriate considering the other medical
8  evidence. (Tr. 437). Plaintiff testified that he discontinued wearing his collar for his
9  appointment with Dr. LaPrade in July, admitting that he was attempting to get a work
10 release as soon as possible in order to qualify to receive Workers' Compensation. (Tr.
11 450). Plaintiff was fired from his job and was unable to work after that due to his
12 condition. (Id.).

13    Maude Prall, a vocational expert ("VE"), testified that Plaintiff's previous jobs
14 were mostly sedentary or light work, with one medium-level work; all jobs had been
15 either skilled or semi-skilled. (Tr. 462). The ALJ presented the VE with a hypothetical
16 based on the nonexamining state agency form which asserted that Plaintiff was capable of
17 medium-level work. (Tr. 464). The VE responded that with the medium exertional level
18 capability recorded in the agency form, Plaintiff would be capable of performing all of his
19 previous jobs. (Tr. 464-465). Next, the ALJ's hypothetical was based on Plaintiff's
20 ability to perform light exertional work. (Tr. 465). The VE responded that Plaintiff
21 would be able to perform all of his past jobs except charter boat captain which was at the
22 medium level. (Id.). Plaintiff's counsel presented the VE with hypotheticals based on the
23 more recent medical assessments reported by treating physicians Dr. Bennett and Dr.
24 Habros. (Tr. 467-468). The VE responded that Plaintiff would not be able to sustain any
25 employment based on the severe level of pain reported by Dr. Habros, nor could he
26 sustain employment at the moderately severe level of pain reported by Dr. Bennett. (Id.).
27          D.    THE ALJ'S CONCLUSIONS
28

1      In July 2005, the ALJ issued a partially favorable decision, granting Plaintiff
2 benefits from April 15, 2002 through April 30, 2003 (Tr. 20),but denying any further
3 coverage (Tr. 23).  Turning to the five-step sequential evaluation process used by the ALJ
4 in determining an applicant's eligibility for disability, the ALJ first evaluated the time
5 period from April 15, 2002 through April 30, 2003; then the ALJ evaluated the time
6 period from April 30, 2003 until the present.
7      In evaluating Plaintiff's case under step one, the ALJ found that Plaintiff had not
8 engaged in any "substantial gainful activity" since his surgery in April 2002.  (Tr. 19).
9 Under the second step, the ALJ found that Plaintiff's impairments were "severe."  (Tr.
10 20).  These included "disorders of the back and neck, affective disorder, and anxiety
11 disorder."  (Id.).  "Severe" impairments, as defined by the Social Security Administration,
12 are those that impose "more than a minimal effect on the claimant's physical or mental
13 ability to perform work related activities."  (Id.).
14      Under step three, the ALJ evaluated whether Plaintiff's severe impairments met the
15 criteria for presumptive disability in the Listing of Impairments, and found that they did
16 not meet this criteria.  (Tr. 20).  The ALJ stated that, "there is no evidence of the
17 abnormal clinical findings necessary to reach listing level severity."  (Id.).  The ALJ
18 states that it "considered the opinions of the State agency medical consultants" in support
19 of its decision.  (Id.).  The ALJ concludes that since no finding of disability can be
20 supported by the medical evidence alone, it was necessary to proceed to steps four and
21 five to determine if Plaintiff is disabled based on his residual functional capacity.  (Id.).
22      Under step four, the ALJ found that Plaintiff was unable to sustain work between
23 April 15, 2002 and April 30, 2003 because of his diminished residual functional capacity
24 following his surgery.  (Tr. 20).  However, the ALJ found that after May 1, 2003, Plaintiff
25 was able to perform his past relevant work.  (Tr. 23).   Also, the ALJ concluded that
26 Plaintiff's mental impairments were not significant enough to limit his residual functional
27 capacity.  (Tr. 22).
28

1   Under the fifth step, the burden of proof shifts to the Social Security
2 Administration to show that there are other jobs in significant numbers that Plaintiff could
3 perform considering his age, education, work experience, and residual functional
4 capacity. (Tr. 23). The ALJ found that Plaintiff had no "transferable skills for jobs with
5 his reduced residual functional capacity" during the period from April 15, 2002 through
6 April 30, 2003, but that after May 1, 2003 Plaintiff could perform his past relevant work
7 at the light exertional level. (Id.).

8   The ALJ rejected the medical opinions of treating physicians, Dr. Bennett and Dr.
9 Habros. (Tr. 27). The ALJ rejected Dr. Bennett's opinion because he had only seen
10 Plaintiff twice, and because he likely based his opinion on Plaintiff's allegations. (Id.).
11 The ALJ concluded that Dr. Habros' opinion about Plaintiff's constant pain and physical
12 limitations was not supported by the treatment notes or the medical record as a whole, and
13 was also likely based on Plaintiff's allegations. (Id.).

14   The ALJ also rejected Plaintiff's subjective complaints since May 1, 2003. (Tr.
15 26). According to the ALJ, the "objective medical evidence and minimal abnormal
16 clinical findings do not support the claimant's allegations." (Id.). The ALJ refers to
17 progress notes citing improvement in Plaintiff's condition and Plaintiff's positive response
18 to injections and physical therapy in support of the conclusion that Plaintiff's condition
19 improved after May 1, 2003. (Tr. 24). The ALJ also notes Plaintiff's various physical
20 activities as inconsistent with his allegations of pain. (Tr. 26). Thus, the ALJ concluded
21 that Plaintiff was entitled to disability benefits from April 15, 2002 through April 30,
22 2003, but denied any further benefits from the Social Security Administration. (Tr. 29).

23 IV.   DISCUSSION

24   Plaintiff claims that the ALJ did not provide sufficient evidence to support its
25 determination that Plaintiff was no longer disabled after May 1, 2003. Plaintiff has raised
26 the following grounds for error in this appeal. First, Plaintiff claims the ALJ erred in
27 rejecting the treating physician assessments by not referencing "specific and legitimate"
28 reasons supported by substantial evidence in the record. (Dkt. #21, p.6). Second,

- 13 -

1 Plaintiff claims the ALJ erred by adopting the July 2002 opinion of Dr. LaPrade and the
2 assessments of nonexamining state agency physicians to find that Plaintiff was able to
3 work after May 1, 2003. (Id. at 14). Third, Plaintiff claims the ALJ erred by discounting
4 Plaintiff's symptom complaints in the absence of clear and convincing reasons for doing
5 so. (Id. at 9). Fourth, Plaintiff claims the ALJ erred by determining Plaintiff's residual
6 functional capacity to be at the light exertional level after May 1, 2003. (Id. at 18).
7 Finally, Plaintiff claims the ALJ erred by concluding that Plaintiff's impairments did not
8 meet the criteria for presumptive disability and for failing to call a medical expert to
9 testify on behalf of this conclusion. (Id.).

10 Defendant argues that the ALJ set forth substantial evidence in support of the
11 determination that Plaintiff was no longer disabled after May 1, 2003. (Dkt. #25, p. 2).
12 According to Defendant, the ALJ interpreted the record in the light most favorable to
13 Plaintiff by granting disability from April 15, 2002 through April 30, 2003, despite
14 "increasing medical evidence of improvement," and the medical opinions of Dr. LaPrade
15 and of non-examining physician's that Plaintiff was capable of work. (Id.).

  A. THE ALJ'S DECISION TO REJECT THE OPINIONS OF DR. BENNETT AND DR. HABROS

18 Plaintiff asserts that the ALJ improperly rejected treating physician's assessments
19 as to Plaintiff's pain and disability, and wrongfully accepted Dr. LaPrade's and
20 non-examining physician's opinions that Plaintiff was capable of work. As a general
21 rule, a treating physician's opinion is afforded more weight than the opinion of an
22 examining physician; and an examining physician's opinion is afforded more weight than
23 the opinion of a non-examining physician. Lester v. Chater, 81 F.3d 821, 830-31 (9th
24 1995); Lawson v. Massanari, 231 F. Supp. 2d 986, 996 (D.Or. 2001). Where a treating
25 physician's opinion is uncontradicted by another physician, it may be rejected by the ALJ
26 only for "clear and convincing reasons" supported by substantial evidence in the record as
27 a whole, and, even if contradicted, the treating physician's opinion may not be rejected
28 without "specific, legitimate reasons for doing so that are based on evidence in the

- 14 -

1  record." Murray v. Heckler, 722 F.2d 499, 502 (9th Cir. 1983). The ALJ can meet this
2  burden by setting out a detailed and thorough summary of the facts and conflicting
3  clinical evidence, stating his interpretation thereof, and making findings. Thomas v.
4  Barhhart, 278 F.3d 947, 957 (9th 2002) (quoting Magallanes v. Bowen, 881 F.2d 747,
5  751 (9th Cir. 1989)). Thus, the question before the Court is whether the ALJ properly
6  considered and disregarded two treating physicians' opinions that Plaintiff suffered from
7  significant levels of pain.

8  In this case, the ALJ did not provide specific and legitimate reasons supported by
9  evidence for rejecting the May 2005 opinions of treating specialists, Dr. Bennett or Dr.
10 Habros, that led to the vocational expert's determination that Plaintiff was still disabled.
11 The reasons set forth by the ALJ for rejecting Dr. Bennett's opinion are that Dr. Bennett
12 only saw Plaintiff on two occasions and that there were "minimal abnormal clinical
13 findings and no objective evidence." (Tr. 27). The ALJ also stated that "Dr. Bennett's
14 opinion is likely based on the claimant's allegations." (Id.). The ALJ rejected Dr.
15 Habros' opinion that Plaintiff could not perform sedentary work because it was "not
16 supported in Dr. Habros' treatment notes, which show numerous complaints by the
17 claimant but minimal abnormal findings" (Id.). The ALJ's reason for rejecting Dr.
18 Habros' opinion that Plaintiff suffered from "severe constant pain" "is not supported in
19 the treatment notes or medical record as a whole." (Id.). The ALJ has failed to recognize
20 the deferential value of treating physician's opinions by not providing specific and
21 legitimate reasons for the rejection supported by evidence in the record. Thus, the ALJ
22 has committed a reversible legal error. The adoption of the recent treating physician's
23 opinions on remand will naturally coincide with a rejection of the non-examining state
24 agency physicians' opinions and the July 2002 opinion of Dr. LaPrade.

25     B.     THE ALJ'S REJECTION OF PLAINTIFF'S CREDIBILITY
26 Plaintiff contends that the ALJ erred by not crediting his symptom testimony.
27 (Dkt#21, p.9). According to the 9th Circuit, "once the claimant produces objective
28 medical evidence of an underlying impairment, and adjudicator may not reject a

- 15 -

1  claimant's subjective complaints based solely on a lack of objective medical evidence to
2  fully corroborate the alleged severity of pain." Bunnell v. Sullivan, 947 F.2d, 341, 345
3  (9th Cir. 1991) (citing Cotton v. Bowen, 799 F.2d 1403, 1407 (9th Cir. 1986)). "Unless
4  there is affirmative evidence showing that the claimant is malingering, the
5  Commissioner's reasons for rejecting the claimant's evidence must be "clear and
6  convincing." Lester, 81 F.3d at 834. Participating in daily activity does not discredit a
7  claim for disability unless the level of activity is inconsistent with the claimed limitations.
8  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998); Lester, 81 F.3d at 833.

9        The ALJ broadly concluded that "[t]he objective medical evidence and abnormal
10 clinical findings do not fully support the extent of the claimant's pain and limitations"
11 (Tr. 23) and that "[t]his evidence is likely to cause some pain, but not to the extent
12 alleged." (Tr. 24). The ALJ cites occasional positive responses to treatment and
13 medication to support this conclusion. The ALJ also stated that "claimant's allegations . .
14 . are inconsistent with his abilities," citing various household chores, school attendance,
15 etc. (Tr. 26).

16       In this case, there is substantial evidence of Plaintiff's underlying impairment.
17 Upon examining the record, it is clear that the ALJ has erred in characterizing the medical
18 record in a way that would indicate Plaintiff's allegations were exaggerated. Although
19 Plaintiff experienced periodic relief from symptoms, Plaintiff consistently sought and
20 received medical treatment for neurologic and rheumatologic pain symptoms long after
21 May 1, 2003. The Ninth Circuit has recognized that an ability to engage in daily
22 activities does not support the conclusion that a plaintiff is able to work on a sustained
23 basis. Reddick, 157 F.3d at 722. Since there is substantial evidence of an underlying
24 condition likely to cause pain, and there is no evidence of malingering, the ALJ erred in
25 failing to provide clear and convincing reasons for discounting Plaintiff's symptom
26 testimony.

27       Plaintiff's fourth claim is that the ALJ erred in determining his residual functional
28 capacity to have changed beginning May 1, 2003. (Dkt #21, p.17). After that date, the

1  ALJ found that Plaintiff was capable of performing light exertional level work (Tr. 26),
2  based on the medical opinions of Dr. LaPrade, the non-examining physicians opinions,
3  and Plaintiff's activities. (Dkt.#25, p.6).   The adoption of the treating physician's
4  testimony and Plaintiff's testimony of his pain and limitations will automatically cure this
5  defect in the ALJ's conclusion about Plaintiff's ability to perform light work.  When
6  given hypothetical questions based on Dr. Bennett's and Dr. Habros' assessments of
7  Plaintiff, the vocational expert testified that Plaintiff would not be able to sustain any kind
8  of employment. (Tr.  467-438).  This testimony support a finding that Plaintiff continues
9  to be disabled for Social Security purposes.

### C.     LISTED IMPAIRMENT 1.04A

Plaintiff's final claim is that the ALJ erred in not accepting Plaintiff's impairment as one of the specifically listed impairments for presumptive disability described in the Social Security Regulations, 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Dkt. #21, p. 18).   At the third step of the disability evaluation process described above, if the impairment "meets or equals" one of the impairments listed under Appendix 1, then the claimant is disabled for the purposes of receiving disability benefits.  Tackett v. Apfel, 180 F.3d 1095, 1098 (9th Cir. 1999).  Only if the claimant does not meet this criteria must the inquiry proceed to the fourth and fifth steps of the inquiry which were already addressed above.

Plaintiff claims to meet or equal the listing criteria for "Disorder of the Spine" because:

> He suffers a disorder of the spine, e.g., spinal stenosis, degenerative disc disease, facet arthritis resulting in compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss, i.e., atrophy with associated muscle weakness or muscle weakness accompanied by sensory or reflex loss.

(Dkt. #21, p.19) (internal citations ommitted).  Plaintiff argues that there is evidence in the record establishing all of these elements and that the ALJ erred by concluding that

- 17 -

1 Plaintiff did not meet this criteria. The ALJ states that "there is no evidence of the
2 abnormal clinical findings necessary to reach listing level severity" and relies on the
3 opinions of the non-examining state agency physicians to support this determination. (Tr.
4 20). In support of the ALJ's conclusion, the Commissioner reiterates the ALJ's
5 determination in a footnote. (Dkt. # 25, p.3).

6       The ALJ erred in failing to provide substantial evidence in support of its
7 determination that Plaintiff did not meet the requirements of "Disorder of the Spine"
8 under 1.04A. Although the ALJ may have "properly considered and rejected" the
9 evidence, the ALJ did not thoroughly discuss the evidence as required by the Ninth
10 Circuit." Tackett, 180 F.3d at 1100. Upon review of the requirements for "Disorder of
11 the Spine," as articulated in the Social Security regulations, it clear that substantial
12 evidence in the record supports a finding that Plaintiff suffers from a spinal disorder, and
13 is *per se* disabled under the third step of the disability evaluation. Since rejecting
14 Plaintiff's claim of *per se* disability is not the only error committed by the ALJ, the Court
15 will proceed with remanding this case for benefits rather than further proceedings on this
16 issue, as authorized by the Ninth Circuit. Lester, 81 F.3d at 830; Holohan v. Massanari,
17 246 F.3d 1195, 1211 (9th Cir. 2001).

18 V.    CONCLUSION

19       Upon review of the entire record, and in accordance with the above analysis and
20 findings, the Court concludes that the ALJ's decision that Plaintiff was no longer disabled
21 after May 1, 2003 was not supported by substantial evidence based on the record as a
22 whole, nor was it free from legal error. The ALJ erred by selectively focusing on the
23 evidence that suggested non-disability, while ignoring the substantial evidence in the
24 record that supported a finding that Plaintiff continues to suffer from an ongoing severe
25 disability. In particular, the Court concludes that the ALJ erred by not affording more
26 weight to Plaintiff's symptom testimony and the opinions of Plaintiff's treating
27 physicians.

28

- 18 -

1  A remand for an award for benefits is appropriate "where 1) the ALJ has failed to articulate legally sufficient reasons for rejecting evidence; 2) there are no outstanding issues that must be resolved before a determination of disability can be made; and 3) it is clear from the record that the ALJ would be required to find the claimant disabled if such evidence is credited." Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  Here, the ALJ has failed to articulate legally sufficient reasons for finding that Plaintiff was not disabled after May 1, 2003.  Once credit is given to the treating physician's and Plaintiff's testimony, there are no longer any outstanding issues and the ALJ would be required to find that Plaintiff is disabled for Social Security purposes.  The Court concludes that on remand, the only determination necessary is that of disability benefits owed to Plaintiff from May 1, 2003 forward.

**Accordingly,**

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment is GRANTED.

**IT IS FURTHER ORDERED** that the Commissioner's Cross-Motion for Summary Judgment is **DENIED**.

**IT IS FURTHER ORDERED** remanding the case for an award of disability benefits owed Plaintiff from May 1, 2003 to the present.

DATED this 24th day of September, 2007.

_____
Mary H. Murguia
United States District Judge